UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| MICHAEL G. SYDOW, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:06-CV-540 RM |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant | ) | |

## OPINION AND ORDER

Michael Sydow seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income under the Social Security Act, 42 U.S.C. §§ 423 and 1381 *et seq.*. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). For the reasons that follow, the court affirms the Commissioner's decision.

### BACKGROUND

When Mr. Sydow applied for benefits, he asserted disability as of January 1, 1999 due to psychological problems. His applications were denied initially, on reconsideration, and after an administrative hearing at which he was represented by counsel.

In evaluating Mr. Sydow's disability claim, the ALJ considered the documentary evidence presented at that hearing and testimony from Mr. Sydow and Christopher Young, a vocational expert, and applied the agency's standard

sequential five-step inquiry, 20 C.F.R. §§ 404.1520 and 416.920. The ALJ found that Mr. Sydow had a severe mental impairment and non-severe back pain; that his impairments didn't meet or equal the severity of any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., Appendix 1 (specifically Sections 1.00 and 12.04); that Mr. Sydow had the residual functional capacity to do simple repetitive tasks that don't involve working with the public or in close proximity or cooperation with others; and that Mr. Sydow could still perform his past relevant work as a janitor, as that job is generally performed. The ALJ therefore concluded that Mr. Sydow wasn't disabled and wasn't entitled to benefits.

The Appeals Council denied Mr. Sydow's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. <u>Getch v. Astrue</u>, 539 F.3d 473, 480 (7th Cir. 2008); <u>Fast v. Barnhart</u>, 397 F.3d 468, 470 (7th Cir. 2005). This appeal followed.

Mr. Sydow contends that the ALJ failed to evaluate his residual functional capacity properly, based the hypothetical to the vocational expert on an erroneous vocational conclusion rather than the specific limitations identified in the record, and improperly discredited his testimony at the hearing. He asks the court to reverse the ALJ's decision and award benefits, or alternatively to remand to the Administration for further proceedings.

STANDARD OF REVIEW

The issue for the court isn't whether Mr. Sydow is disabled, but whether substantial evidence and the law supports the ALJ's determination that he was not. Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993). If so, the court must affirm the Commissioner's decision. Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007); Rice v. Barnhart, 384 F.3d 363, 368-369 (7th Cir. 2004); Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). The substantial evidence standard prevents the court from "reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility" — in short, substituting its own judgment for that of the Commissioner, Williams v. Apfel, 179 F.3d 1066, 1071-1072 (7th Cir. 1999); *accord* Powers v. Apfel, 207 F.3d 431, 434-435 (7th Cir. 2000) — and requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).

DISCUSSION

*The Medical Evidence*

Mr. Sydow has been treated for psychiatric problems for several years, and has a sporadic employment history that he attributes to behavioral problems associated with his mental impairment. He was hospitalized for a week in August 2002 for observation and treatment after an argument with his mother and belligerent and uncooperative behavior with police.

Shortly after his discharge from the hospital, Mr. Sydow was evaluated by consulting psychologist Dr. Robert Walsh for the purpose of obtaining a report in support of his claim for Medicaid and disability. Dr. Walsh observed that Mr. Sydow appeared to have an average to below average level of intelligence and fair to poor insight and judgment, and that his attention and concentration were within normal limits. He found that Mr. Sydow's Minnesota Multiphasic Personality Inventory-2 profile indicated an individual who ruminates a great deal, shows obsessive-compulsive-like behavior, is intense, anxious and distressed, may have a tendency to overreact with a great deal of anxiety, suspicion, and concern, is rigid at times and has significant problems controlling and expressing his anger. Dr. Walsh noted, however, that:

> Results of the MMPI-2 indicate that is should be interpreted with caution. It is possible that [Mr. Sydow] may have exaggerated his current situation and problems. He reports a significant number of psychological problems which may have resulted from a poor reading ability, confusion, disorientation, stress, or a need to seek attention for his problems. It is possible that he may have produced an invalid profile and that he may be malingering by attempting to present a false claim of mental illness. It's important to determine the source of his response pattern. The possibility of delusions and a thought disorder may be present and he may be exhibiting a high degree of distress and personality deterioration.

Dr. Walsh also observed that Mr. Sydow was inflexible in interpersonal situations, touchy and hostile with others, insecure in relationships, hypersensitive to rejection, emotionally detached, rigid and over-controlled, and prone to the development of an addictive disorder. He diagnosed bipolar and paranoid

4

personality disorders and recommended that Mr. Sydow continue with medication management and consider individual outpatient therapy.

For the next two years, Mr. Sydow received outpatient treatment at the Swanson Center, where he was seen by Dr. Kumud Aggarwal, a psychiatrist, and various clinical social workers. Dr. Aggarwal managed Mr. Sydow's medication and participated in the treatment planning process. The social workers implemented and routinely reviewed his treatment plan, provided counseling, and evaluated Mr. Sydow's progress under Dr. Aggarwal's supervision. Treatment notes from Swanson Center indicate that Mr. Sydow frequently missed appointments, but exhibited no anger outbursts or aggressive behavior when he was compliant with prescribed treatment– medication and counseling.

A primary objective of Mr. Sydow's master treatment plan at Swanson Center was to obtain and maintain gainful employment. That objective was repeated in every treatment review from October 2002 to July 2003. Carmen McCoy, the social worker with whom Mr. Sydow had frequent contact, repeatedly recommended referral to vocational services, but Mr. Sydow declined. On one such occasion, Ms. McCoy noted that: "Client does not want referral at this time as he does not want to complicate his application for disability." At a July 2003 appointment, Mr. Sydow reportedly said he wasn't actively seeking employment because "it may cause [him] not to get disability." In March 2004, when asked about getting back to work, Mr. Sydow reportedly responded "by stating that his lawyer advised against that because it would jeopardize his disability approval."

5

An August 2004 clinical assessment and treatment summary prepared by David Word (another clinical social worker at Swanson Center) noted that there had been very little contact with Mr. Sydow during the year, that Mr. Sydow "exhibit[ed] an indifference with regards to medication and/or one-to-one individual therapy" and "ha[d] made no efforts to initiate any type of positive change," and that there had been no significant or remarkable changes in his behavior. Mr. Word opined that Mr. Sydow's condition could improve, but the prognosis was poor due to his history of noncompliance. In an October 2004 treatment summary, Mr. Word stated that Mr. Sydow failed to show for a scheduled therapy session and reiterated that the prognosis for improvement remained poor. The psychological assessment Mr. Word completed three days later indicated that Mr. Sydow's ability to make occupational, performance, and personal/social adjustments was poor to non-existent, and that "it [was] highly unlikely that (even with medication) [Mr.Sydow] will ever be able to seek or sustain viable employment or be able to interact normally while in a work environment."

Dr. Klion, a state agency psychologist, reviewed Mr. Sydow's case in October 2002, and opined that while Mr. Sydow had a medically determinable mental impairment, it didn't satisfy the "A" and "B" criteria for Listing 12.04 (Affective Disorders). 20 C.F.R. Pt. 404, Subpt. P., App. 1, Sec. 12.04(A) and (B). With respect to the "B" criteria (functional limitations), Dr. Klion noted that Mr. Sydow had a moderate degree of limitation in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining

6

concentration, persistence, or pace; but had no repeated episodes of decompensation of extended duration. Dr. Klion expressed no opinion with respect to the criteria listed in Section 12.04(C).

In assessing Mr. Sydow's mental residual functional capacity, Dr. Klion indicated that Mr. Sydow was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to accept instructions and respond appropriately to criticism from supervisors. Dr. Klion concluded that Mr. Sydow nonetheless remained capable of performing simple repetitive tasks. A second agency psychologist, Dr. J. Gange, affirmed Dr. Klion's findings.

Finding that while Mr. Sydow's mental impairment was severe, "[n]o treating or examining physician, psychiatrist or psychologist has reported findings equivalent in severity to the criteria of any listed impairment," the ALJ proceeded at the fourth step of the disability evaluation to determine if Mr. Sydow had the residual functional capacity to perform his past relevant work. He found that Dr. Klion's assessment of the severity of Mr. Sydow's mental impairment and the limitations it imposed was more consistent with the treatment records from Swanson Center which reflected significant improvement with medication when compliant, and was entitled to greater weight than Mr. Word's opinion.

Mr. Sydow disagrees. He contends that the opinions of his treating physicians and specialists (Dr. Aggarwal and David Word) were consistent with the

7

other evidence of record and should have been given controlling weight under the treating physician's rule and SSR 06-03p.

Mr. Sydow asserts that Dr. Aggarwal provided multiple opinions, and that the ALJ ignored all of them. But he cites only example: a notation in an October 2004 treatment plan which indicates that "[Mr. Sydow] continues to experience difficulties [with] anger management, chronic feelings of depression, [and] poor interpersonal communication skills." Mr. Sydow attributes the statement to Dr. Aggarwal, but David Word, a clinical social worker, prepared the report and signed as "primary provider." While a psychiatrist's signature appears at the bottom, the signature is illegible and attests only that the individual "participated in the treatment planning process." The Swanson Center records contain notes from Dr. Aggarwal, but those notes generally relate only to the management of Mr. Sydow's medication.

Mr. Sydow's assertion that Mr. Word's opinion was entitled to controlling weight is inaccurate. Mr. Word isn't an "acceptable medical source" under 20 C.F.R. § 404.1513(a)), or a "treating source" as defined in 20 C.F.R. § 404.1502, and his opinion isn't entitled to controlling weight. *See* 20 C.F.R. 404.1527(d) and 416.927(d). He saw Mr. Sydow only once, and concluded that it was "highly unlikely" he'd ever be able to sustain employment. Mr. Word's opinion can be, and was, considered as evidence from an "other source" under 404.1513(d), but it wasn't based on a long-term treating relationship with the claimant, or supported by objective evidence, or consistent with other medical evidence in the record,

8

specifically the treatment notes from the other social workers at Swanson Center, Dr. Walsh's evaluation, and Dr. Klion's assessment, and wasn't endorsed by Dr. Aggarwal.

Mr. Sydow's assertion that a remand is required in light of the SSR 06-03p is erroneous. The purpose of SSR 06-03p was to clarify how the Administration considers opinions and other evidence from sources who are not "acceptable medical sources," *i.e.*, the "other sources" identified in 20 C.F.R. 404.1513(d). The Administration recognized that:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

The ruling directs that the same factors that apply to the evaluation of medical opinions from "acceptable medical sources" (licensed physicians, psychologists, optometrists, podiatrists and qualified speech-language pathologists) can be applied to opinion evidence from "other sources." Those factors include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with the record as a whole;

- The degree to which the source presents relevant evidence to support an opinion;

9

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

SSR 06-03p.

The ruling states that: "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source" *i.e.*, "if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." Id. "[T]he adjudicator generally should explain the weight given to opinions from these "other sources,"... when such opinions may have an effect on the outcome of the case." Id.

SSR06-03p became effective after the ALJ issued his decision and the Appeals Council denied his first request for review, so the ALJ can't be faulted for not considering it.[1] Still, nothing in the record suggests the outcome would be different if he had considered it. The ALJ considered Mr. Word's opinion and sufficiently identified his reasons for giving Dr. Klion's opinion greater weight. SSR 06-03p requires nothing more.

---

[1] The Appeals Council issued a second notice of action on June 28, 2007 setting aside the first to consider new evidence, and denying Mr. Sydow's renewed request for review.

Mr. Sydow contends that the ALJ should have recontacted Mr. Word if he believed his opinion wasn't adequately supported, and that his failure to do so warrants reversal or remand. The court again disagrees.

Mr. Sydow had the burden of proof at step four, Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004), and was represented by counsel at the administrative hearing. He "is presumed to have made his best case before the ALJ." Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007); Sears v. Bowen, 840 F.2d 394, 402 (7th Cir. 1988); Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987). While the ALJ still has a duty to develop a full and fair record, courts will generally defer to the ALJ's judgment with respect to how much evidence is necessary, and will require a significant omission before they'll find that duty was breached. *See* Nelms v. Astrue, F.3d , 2009 WL 188034 (7th Cir. Jan 28, 2009); Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994); Binion v. Shalala, 13 F.3d 243, 246 (7th Cir. 1994). "[A]n omission is significant only if it is prejudicial." Nelms v. Astrue, F.3d at , 2009 WL 188034 (7th Cir. Jan 28, 2009); *see also* Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997). Mr. Sydow didn't identify what additional information Mr. Word could have provided that the ALJ didn't already have, and hasn't shown how the ALJ's failure to recontact Mr. Word prejudiced him. Because there was sufficient medical evidence presented to permit the ALJ to make a reasoned determination about the severity of Mr. Sydow's mental

impairment and it's effect, the ALJ wasn't required to seek additional information from Mr. Word. Adequate evidence already reasonably supported his conclusion.

*The ALJ's Credibility Determination*

Mr. Sydow next contends that the ALJ improperly discredited his testimony at the hearing. A review of the record shows otherwise. Social Security Ruling 96-7p outlines how an ALJ should assess a claimant's credibility when allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, and directs that the ALJ's evaluation:

> must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight....It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered...[nor is it] enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

Zurawski v. Halter, 245 881, 887 (7th Cir. 2001) (internal quotation marks and citations omitted); S.S.R. 96-7p. In addition:

> the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record.

S.S.R. 96-7p.

The ALJ did just that. He found that Mr. Sydow's allegations regarding his limitations weren't totally credible because they weren't consistent with his self-described activities of daily living and the medical evidence, which consistently indicated improvement when Mr. Sydow was compliant with prescribed treatment.

Unlike pain, the symptom which Mr. Sydow alleges to be disabling—temperamental outbursts—is objectively verifiable. As the ALJ correctly pointed out, the medical evidence clashes with Mr. Sydow's testimony about his limitations and the effect they have. Swanson Center treatment notes indicate that Mr. Sydow didn't experience outbursts when he was medication compliant, and didn't follow-up on a primary objective of his treatment plan—to obtain employment—because he thought it would impact his disability claim negatively.

Credibility determinations aren't overturned unless they are clearly incorrect. Zurawski v. Halter, 245 F.3d at 887; Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). The court defers to the ALJ's decision if substantial and convincing evidence supports it. Sims v. Barnhart, 442 F.3d 536, 537 (7th Cir. 2006). Mr. Sydow's testimony at the hearing was vague, self-serving, and inconsistent with the medical evidence. The ALJ adequately articulated his reasons for discrediting Mr. Sydow's testimony and substantial evidence in the record supports his decision. Under the circumstances, the court cannot find that the ALJ's assessment of Mr. Sydow's credibility was patently wrong.

*The Hypothetical*

Mr. Sydow contends that the ALJ erred by presenting the vocational expert with a hypothetical that didn't account for all his mental limitations and was based instead on the ALJ's inaccurate conclusion that Mr. Sydow was limited to simple repetitive tasks. Mr. Sydow doesn't dispute that he can do simple repetitive tasks, but contends he can't maintain any type of employment because of his "temperamental outbursts." He contends that the ALJ's hypothetical should have included the specific limitations he identified in his testimony at the hearing and Mr. Word identified in his reports, and not erroneous conclusions about the type of work he could perform.

While the ALJ ordinarily should include all limitations supported by the medical evidence in the hypothetical to ensure that the vocational expert has all the relevant information needed to provide a fully informed and reliable answer, Kasarsky v. Barnhart, 335 F.3d 539, 543-544 (7th Cir. 2003); Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002), the ALJ must incorporate only those limitations that he accepts as credible. Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007). The ALJ found neither Mr. Sydow's testimony about his limitations nor Mr. Word's opinion on the subject credible, and, as already discussed, adequate reasoning and substantial evidence support those findings. Inclusion in the hypothetical posed to the vocational expert, therefore, wasn't necessary. *See* Sims v. Barnhart, 309 F.3d 424, 432 (7th Cir. 2002) (no error when ALJ told vocational expert to consider only those impairments that were supported by evidence in the record).

Mr. Sydow contends that the state agency psychologists' opinion about his limitations actually supports a finding of disability and should have been included in the hypothetical to the vocational expert, but weren't. As an offer of proof, he submitted an excerpt from a transcript of the administrative hearing in an unrelated case, Kangail v. Barnhart, in which an unidentified individual (purportedly a vocational expert) opined that "once somebody hits about five moderates [functional limitations] then — it kind of depends on the combination — but generally that precludes work." Mr. Sydow maintains that this excerpt demonstrates that the ALJ's failure to include the mental limitations referenced in the state agency psychologists' opinion in the hypothetical posed to the vocational expert was harmful error. The ALJ, however, can't be faulted for failing to consider evidence never presented to him, Eads v. Secretary of Department of Health and Human Services, 983 F.2d 815, 817 (7th Cir. 1993), and the court can't and won't consider new evidence at this stage of the proceedings.

The ALJ's hypothetical would have been improper only if he hadn't accounted for the limitations he found to be supported by the record. *See* Steele v. Barnhart, 290 F.3d at 942. But the ALJ did that. Mr. Sydow's contrary assertion is inaccurate.

The state agency psychologists found that Mr. Sydow wasn't significantly limited in any work-related areas of mental functioning, but was moderately limited in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, and

15

to accept instructions and respond appropriately to criticism from supervisors. Dr. Klion converted those findings into a specific residual functional capacity assessment, concluding that Mr. Sydow still could perform simple repetitive work that didn't require him to work in close proximity or cooperation with others. A second state agency psychologist, Dr. Gange, affirmed those findings.

The ALJ relied on Dr. Klion's and Dr. Gange's mental residual functional capacity assessment and included it in his hypothetical to the vocational expert. He asked if a person of Mr. Sydow's age, education and work experience would be capable of performing any of his past employment, either as he performed it or as it is usually performed in the national economy, if he was "limited to simple repetitive tasks [that] [w]ould not require working with the public or in close proximity or cooperation with others?" The vocational expert testified that the janitor position, as usually performed, would fit within those limitations. The ALJ credited the vocational expert's uncontradicted testimony, and concluded that Mr. Sydow was capable of performing his past relevant work as a janitor as generally performed. Because Dr. Klion was the only credible medical expert who made a residual functional capacity determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical and on the vocational expert's testimony in determining whether Mr. Sydow could still perform his past relevant work. Johansen v. Barnhart, 314 F.3d 283, 288-289 (7th Cir. 2002); Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir. 1987).

*Bi-Polar Disorder and GAF Scores*

Mr. Sydow makes a cursory argument challenging the ALJ's failure to address specifically or understand the significance of Dr. Walsh's diagnosis of bi-polar disorder and a hospital liaison's report that Mr. Sydow had a GAF score of 20 when he was hospitalized in August 2002. Any such error would not affect the outcome and so is harmless.

Dr. Walsh wasn't a treating physician. He saw Mr. Sydow only once for the sole purpose of providing a report for Mr. Sydow's Medicaid and disability claims. While Dr. Walsh diagnosed bi-polar disorder, the ALJ correctly noted that: "[n]o treating or examining physician, psychiatrist or psychologists ha[d] reported findings equivalent in severity to the criteria of any listed impairment." Indeed, Dr. Walsh stated that:

> Results of [Mr. Sydow's] MMPI-2 indicate that is should be interpreted with caution. It is possible that [Mr. Sydow] may have exaggerated his current situation and problems. He reports a significant number of psychological problems which may have resulted from a poor reading ability, confusion, disorientation, stress, or a need to seek attention for his problems. It is possible that he may have produced an invalid profile and that he may be malingering by attempting to present a false claim of mental illness. It's important to determine the source of his response pattern. The possibility of delusions and a thought disorder may be present and he may be exhibiting a high degree of distress and personality deterioration.

Mr. Sydow's assertion that the ALJ's residual functional capacity determination is materially flawed because he ignored a hospital liaison's report in August 2002 that Mr. Sydow had a GAF score of 20 also is unpersuasive. The GAF scale measures a "clinician's judgment of the individual's overall level of

17

functioning," and is intended to be used to make treatment decisions. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Text Rev.2000). Neither Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based solely on his GAF score. *See* Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir.2002) (GAF score may assist ALJ in formulating claimant's residual functional capacity, but is not essential). Mr. Sydow's GAF score didn't remain constant, but improved significantly after he began treatment, as shown by Dr. Walsh's August 2002 evaluation which reported a GAF score of 60, and an October 2002 report from Swanson Center which showed that Mr. Sydow had a GAF score of 55. Both scores indicate "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning," American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text Rev.2000), and are consistent with the limitations found in the state agency psychologists mental residual functional capacity assessment and relied upon by the ALJ.

CONCLUSION

For the foregoing reasons, the court AFFIRMS the decision of the Commissioner of Social Security.

SO ORDERED.

ENTERED:     February 10, 2009

      /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court